Madam Clerk, please call the first case. Case 214-051, Pistakee Marina v. Caldera. Counsel, you may proceed. Good morning. Good morning. May it please the Court, my name is Lindsay Beach and I represent the employer in this matter, Pistakee Marina. There are two main issues before this Court on the employer's appeal. The first being the correct calculation of the average weekly wage and the second being the award of penalties and fees. Regarding the calculation of the average weekly wage, as you know, the Commission found the average weekly wage to be $1,234.75. The employer believes this finding is against the manifest weight of the evidence and that the correct average weekly wage should be $700.43. Just to clarify, you're not disputing that earned commissions are included in the actual earnings, correct? No, not at all. We are disputing the way that the Commission calculated the commissions. So here the main issue is that calculation. The employer works as a yacht salesperson. It's undisputed that he earns $650 a week in base pay. He was selling yachts? Yes. Okay. Sounds like a good job, right? Sounds like it should be lucrative, right? Well, we'll see. We'll see what you decide on that. The employee testified that he earned 4% commissions on sales. He then later testified that he earned 2% commissions on shared sales. He claimed that he wasn't paying commissions from years of 1988 through 1990. The accident was in 1990. So he filed a claim with the Wisconsin Department of Labor for wages. The employer always disputed that he was entitled to those commissions, which is why they weren't paid. Didn't the Commission essentially believe the claimant? Didn't they hold him to be credible? They did. So what's wrong with that? Well, what's wrong with that is the way that they calculated the commissions. The Wisconsin Department of Labor had the opportunity to review all of the evidence that he submitted in 1991 before the hearing. And they concluded— That was at that time of the hearing, though, right? I'm sorry? That was at that hearing, at that time of the hearing. Correct. That was in 1991, so much closer in time to the accident than the arbitration. But the Commission had more documentation than they decided, right? Well, the Commission had different documentation. Well, more, right? More. Yeah. Yeah, it's true. The Wisconsin Department of Labor concluded that in the year before the accident, which is the period we're looking at, that he earned $2,622.14 in commission. If you divide that by 52, that's $50.43 added on to the $650 base pay. So is that where your collateral estoppel raised you to kind of argument comes in? Is that where you're going? That's where I'm going. Well, the first question I have is tell us how the issues are identical, which is an element that you would have to establish for our satisfaction. Correct. The issue is the correct calculation of his commission. Was it Wisconsin dealing with an issue of unpaid wage and vacation? They also dealt with that. That is true. So how are the issues the same? Arguably, they're similar. Well, wait a minute. Similar doesn't do the trick. It's an argument. I understand that. I'm not saying it's our strongest argument, but it's an argument. Maybe you better get the strongest one. All right. Okay. We'll record it. It was an argument, so. I'm sorry? We'll record it. You make the argument on it. Okay. Thank you. I appreciate that. At trial, the employee presented over 400 pages of handwritten receipts. And he said that his attorneys back in the day, back in the 90s, had asked him to get all of those together, and that he did. Why did he not present those to the Wisconsin Department of Labor? Where did they come from is our question. Why did he have them in 2011? He didn't have them in 1991. But isn't that a matter for the commission to weigh in on the weight of the evidence and the credibility? There was an objection made to admitting that evidence into the record, and it was ruled to be a business record. How it was ruled to be a business record, I'm kind of unclear, because there wasn't a person from the business testifying that it was a business record. They were handwritten receipts made by the petitioner. So our argument is that no weight should be given to those documents, and no weight should be given to the Wisconsin Department of Labor decision, who had the opportunity to review all the documents he had in the 90s, which is much closer in time than the arbitration in 2011. So the commission is supposed to throw up their hands and say, well, Wisconsin ruled on this issue, so therefore it's over? Our argument is that decision is better evidence than the handwritten records made by the employee in this matter right before arbitration in 2011, 20 years after he allegedly had them. It's very suspicious. Where did they come from? I see the argument, but again, it's just the argument. Okay. The second kind of issue contained within the average weekly wage calculation was that of an alleged stipulation to an average weekly wage. Over the time period the case was proceeding in the 20 years. Mr. Hannigan put on a couple of witnesses that were the previous attorneys in the case and asked them if there had been a stipulation. They both testified, as did the employee, that no signed stipulation was ever made. So he's alleging that the stipulation was for $969.39. We argue that since no signed stipulation was ever made, that that should be given no weight. And we submit that the average weekly wage should be the $700.43, which is the $650 base pay, plus the $50.43 a week commission. The second issue is the award of fees and penalties. The commission awarded fees and penalties in the amount of $80,971.18. We believe that to be against the manifest weight of the evidence. As you know, the employee must have had, unreasonably, this vexatious delay in payment. The delay must have been deliberate or the result of bad faith. We argue that there's no bad faith here. As you know, the case was pending over 20 years. There are many different petitions that were filed but were never brought to hearing. So why didn't they pay the benefits? What's this issue? They thought the action should have been brought in Wisconsin rather than Illinois. Is that the gist of it? Well, that was one of the issues. Back in 1990 to 1991, it was unclear whether it was going to be a Wisconsin case or an Illinois case. When it was initially picked up in 91, it was paid at the Wisconsin rate because they thought it was going to be a Wisconsin case. There was also initial issues due to accident, jurisdiction, wages, employee-employee relationship, and medical benefits. So that was the initial issue. Then TTD checks were issued starting in 1991 up through 1995, and the employee refused to cash them. He said they were at the incorrect rate, which, as you know, has been a- What difference does that make whether the employer cashed it or not? Whether the employee cashed the checks? The employee, yeah. It was an issue for us because we placed a stop payment on them eventually because they were no good any longer. So we even wrote to him and said, cash them, we won't hold that against you. That's fine if you want to bring up the issue later. Did the arbitrator give you credit for some of that? I'm sorry? Did the arbitrator give you some credit for some of that? Yes. They gave us credit for the checks that were paid, but they still assessed penalties against those checks, which is not sensical to me. Okay. He didn't cash the checks for five years, so we stopped issuing the checks because he just wasn't cashing them anymore. What interest is it to you whether he cashes the checks? I think it just becomes a burden on the insurance company to keep having to place stop payments on all these checks. To do what arguably they're supposed to do. No, to keep having to place stop payment on all these checks that aren't going through. Why do they have to issue stop payment? Because the checks aren't good anymore. They don't want all these checks just floating. Do you care whether he cashed it and spent it on a Mercedes? I don't care what he spends the checks on. Then you shouldn't care whether he cashed it, should you? The insurance company cares if he cashes the checks or not. The bank is going to not pay them if they're stale, David. So why should you put a stop payment on them? What difference does that make? Well, one of the issues that Mr. Hannigan brought up is that he then went to the bank six, eight months later, tried to cash the checks, and those were rejected. And that was an embarrassment for him, and it caused a big problem. Oh, gee, that's too bad. Penalties shouldn't be assessed on those checks. But the arbitrator only assessed penalties on 112,000 out of 469,000, and the commission suggested that you were late on most every payment. There were some late payments. There were. But in 2005, the employer issued all the past due checks that weren't cashed in a lump sum to him and then paid him TTD up through the date of arbitration. So we argue that no penalty should be awarded as the employee is. That was in 2005? Correct. The employee himself was causing the problem. And the first payment was made in, what, September 91? 91. Correct. The second issue for fees and penalties was the award for delay in treatment for medical. Over 20 years, there was different allegations about the various delays that were made. One of the issues was due to the date of accident. On several of the medical records, the date of accident was listed incorrectly, and the insurance company isn't going to pay for bills for an accident. Is there anything in the record that suggests that the penalties were awarded by reason of delay in authorizing treatment? Yes. What? The arbitration decision. What does it say? That they awarded fees and penalties not under payment, under the award of fees and penalties because you didn't make your payments on time. Are we talking now about the medical or the TTD? Well, TTD, we know they awarded penalties on that. Correct. Where in the decision does it say that they awarded as a monetary penalty on failure to pay authorized treatment timely? I couldn't cite to the exact page off the top of my head, but I know that the arbitration decision does state that fees were assessed against delay in treatment, forcing things such as the neurogenics testing, cystoscopy, MRI testing. I did read that in the decision, and fees were assessed against that. But they're in the arbitrator's decision, right? Correct. It's in the arbitrator's decision. And you're saying that's the fault of the claimant, right? Correct. Correct. We're saying that a lot of the medical records were unclear as to the date of the accident. Some of the issues brought up were for treatment related to the shoulder, which was eventually found to be unrelated. It was due to a fall at home. Also, it was requests for testing on numerous basis that had been performed. I mean, over 20 years, obviously, the man had many, many MRIs and CT scans and things like that. Also, there was an issue about a stand-up MRI that the employee himself was not responding to requests to schedule that, and we contacted him over 13 times, and he didn't respond, and there were fees assessed against that. So overall, we feel that any delay in treatment, some of it was due to confusion in the medical records, and some of it was due to the employee himself. So overall, the employer requests that you reverse the decision of the commission in regards to fees and penalties and average weekly wage. Any other questions? I don't believe there are. Thank you. Thank you. We have time for a reply. Good morning, Justices and Counsel. My name is Richard Hannigan. I represent Mr. Berzowski. I filed a cross-appeal on the issue of whether or not the bond filed by the plaintiff was, in fact, a valid bond. At the Circuit Court, I introduced the documentation that certifies that the corporation was not in existence. It was a Delaware corporation. It was not licensed. It was defunct in Illinois. And my question is, given the L.A. Armored Car Corporation and the Deutschmüller case, how can an individual sign a bond binding a corporation that does not exist satisfy Section 19F2? How would he be satisfied with a corporation that's been dissolved? Well, I think this Court has dealt with that issue when an adjuster for an insurance company, I believe Justice Hoffman wrote the decision, filed the bond and said, how could this be fair? I mean, the corporation is bankrupt. And this Court has stated that if it is not evident that the respondent is obligated to buy the bond during the 20-day filing period, the purpose of the bond, that a claimant has a method of collecting an award against the respondent, is defeated. And strict compliance with the statute has not been met. And constitutionally, every litigant must have a right to an appeal. And how can you bar them the right to appeal because they were dissolved? Dissolved corporations can be sued, they just can't sue. So I don't understand how you could bar them from bringing a review and appeal. But this Court has done that. No, adjusters don't sign for corporations. This is a corporate officer that signed.  Well, can you tell me how they could exercise their constitutional right to sue? If they don't exist, how did you bring a workers' comp case against them? They existed at the time. Well, they didn't exist at the time the award was entered, did they? Well, if in fact this individual has apparent authority and we bring it back. Mr. Hannigan, you didn't answer my question. How is it that you've got an award against them if they have been dissolved? We what? Tell me. By statute. By statute, you can get an award against a dissolved corporation? Right. Of course you can. They can be a defendant. And if they can be a defendant, they can appeal. To me, if you follow the statute and construed statute. The statute may be in those provisions subject to constitutional challenge. Well, it's something that the legislature certainly could have looked at. That decision was before June 28, 2011. And in their sweeping changes in the act, they didn't deal with that. Are you aware of the Subway Restaurants v. Riggs case? Pardon? Are you aware of the Subway Restaurants Inc. v. Riggs case? How do you respond to this holding? A foreign corporation may engage in occasional transactions without being required to maintain authorization to conduct business in Illinois from the Secretary of State. According to you, that's it. If they don't have a license from the Secretary of State, they're not authorized. It's over. They can't do anything. That case would suggest the opposite. But that case assumes that it's a foreign corporation. In our case, it's not even a corporation. So you're saying, and I think I heard you say it the opposite, is that it was a Delaware corporation which had been dissolved, is that correct? That's correct. And it was dissolved after a commission award against it? When was it dissolved? Now, it may not pay the $1,000, or it used to be $1,000 to do business in Illinois when you're an outside corp. I don't have that document. I could not find the document, my copy of the document that the circuit court had. Anyway, the court didn't accept that argument. Is that correct? That's correct. Then I'll move on. Counsel, I'll respond at the same time. Can I focus on something that I think was raised by opposing counsel that we were somewhat interested in, Ben? And that is the arbitrator on penalties included a delay of medical payments. The arbitrator based the penalties strictly on the TTD issue. Take a look at page 840 of the appendix, which is the arbitrator's decision. And I think you're going to find out that the arbitrator did in fact. In this case, the conduct of the respondent requires a finding that the respondent shall pay penalties pursuant to 19K and attorney's fees pursuant to 16. There was unreasonable conduct as to the authorization of treatment. That's correct. But they didn't calculate it that way. They used the TTD to calculate it. Can you tell us how it was calculated? Yes. First of all, there was 41 weeks that they didn't pay TTD. Then they took the 151,000 some odd dollars that they paid that wasn't cashed for those five years and gave them credit for that in calculating the penalties. And then they did the 19L and the attorney's fees based upon that. So they did get a credit for the five years. 19L is easy. Those are late payments. What about 19K? How do you calculate the 19K? Right. So. I mean, the decision isn't very clear about how it was calculated. Right. So they were paying $378 a week from September of 1991 up until I believe it's April of 2005. The arbitrator gave them credit for all of that. And then he deducted what was due. Because if you look at the average weekly wage and the TTD rate, you then subtract the $378 a week from the $619.28. Then they took that as the base amount for penalties, 50% of that, 20% of that for attorney's fees. Now, in my argument, you're either all in or you're all out. And I could cut both ways. They say that there were disputes as to jurisdiction. And they say there were disputes as to accident. And they say that there were disputes as to average weekly wage. But nobody, nobody testified as to what the dispute was. What was their good faith dispute that allowed them not to pay the petitioner a dime for 41 weeks? When he testified that he was hired in Illinois, he started work in Illinois, did somebody say, oh, no, he didn't? Did somebody say the accident occurred when he was, you know, hit by a golf cart on Sunday? Nobody testified to that. Nobody came in and testified to any of those issues. So was that a good faith dispute? It wasn't. Just because they said there were disputes, aren't we supposed to be entitled to know what those disputes were? Well, it's the burden that's on the employer at that point. Well, the petition for penalty shifts that burden to the employer, yes. So my question is, if we look at Moore, are we going to sanction the conduct? And my client did not cash any check for five years. It was over a $200 underpayment every week. But he was going to be, gosh darn, if he was going to validate what the respondent was doing. Now, that was a $200 underpayment on the uncashed checks every week, is that correct? Right, a little over that. Did the arbitrator take that $200 into consideration? Yes, because he multiplied, you know, the weeks times 378. So mathematically, they both got their respective wages. It should have been $618.23. So you're saying Moore says you can't credit, it's got to be based on the entire amount of DT benefits, you can't do anything less? Well, what the rationale in Moore is, and what they were arguing is, look, what happens when they pay all the benefits the day before trial? And they withheld it for years. Now there's no penalty? I believe that the commission has the option of doing 19K on what has not been paid, or on all of the benefits in that category. Yeah, but there is a later case. You've got this Roadhouse Envelope v. Industrial Commission that says they held that Moore did not preclude the commission from crediting certain payments that were made before the ruling imposing penalties. That's correct. All right. Yes, they have the option. All right. So if they have the option, and they could have calculated the penalties based upon the acknowledgement in 2005 as to the amount of the underpayment being, or nonpayment being $400,000. They didn't come in and explain why, after they accepted the maximum TTD rate and the maximum PPD rate as an agreement, as to why they didn't pay it all in one month's time. It took them over a year to make the petitioner current, and then they paid and continue to pay at $618.23 per week. So the arbitrator, in my opinion, should have written penalties at all. In our brief, over the 21 years, the medical records are replete with pleas from the psychiatrists and the doctors for certain tests, for medication, the psychiatric medication that wouldn't be authorized, year after year after year. And the arbitrator alludes to that in the issue of penalties. And we have, the council cited Howard Casino Arroyo. And I certainly believe, in deference to the three members that signed that, that Justice Holmgren's dissent in that was appropriate. And hopefully one day, if not today, that decision would be overruled. His decision, or the? Privately. Never mind. God, I miss so much. So basically, I'm looking at 19K penalties on $674,312.29, totaling $337,37,156.20. And then I also ask for penalties on all the medical paid, and that's over $700,000, and I put those numbers in my briefs. The conduct of the respondent in this case, I believe, was tortious. And I believe that a message should be sent that nobody, not your husband, not your wife, not your child, not your siblings, should ever be treated the way Mr. Berezovsky was treated. Thank you. May I ask a question, Mr. Healy? Yes, sir. Did you file a cross-appeal? Yes, I did. You did? Okay. I have a copy of these. I'm looking for it, and I'm not finding it. Your Honor, I have a copy of this. Well, I don't believe the bench received it. No, I'm not going to receive it now. The bench didn't receive it. It's been referenced in the briefs, but we did not receive it. May I supplement? What we're saying is you didn't include it in the appendix. I mean, it may be in the record. I don't know. Thank you. I've warned people about those questions. It's not there. It's not there. There is no notice of cross-appeal in the appendix. There's no appendix. And there's no captioning of it either. We make some argument on page 38 of your brief saying the commission's award of penalties and fees is supported by the manifest way of the evidence, which should be increased, but there's no indication here you're telling us you made a cross-appeal. There's no appendix. Nothing. But don't you think you should tell us that and put it in an appendix? Yes. Okay. Thank you, counsel. Counsel, you may reply. Thank you. Just briefly regarding the motion to dismiss issue. I just wanted to read section 19-F-2 of the act regarding the bond. It says no such summons shall issue unless the one against whom the commission shall have rendered an award for payment of money, dot, dot, dot. The more important part of it is one against whom the commission shall have rendered an award. In this case, the entity against which the commission entered an award is Pistica Marina, and that's buying through William Slater, who's the owner. There's several cases that Mr. Hannigan cited to, including Dyke-Mueller, that held that the employer's attorneys can't sign the bond. Illinois Armored Car held that the employer's attorney couldn't sign, nor could the insurance company. And then Vallis is a more similar case, in which they found the insurance company couldn't sign the bond after the employer went out of business. So, what are we supposed to do? And I think you all kind of made that point when asking him questions. The award was entered against Pistica Marina, therefore Pistica Marina has to be the person that signs the bond, or the bond wouldn't be valid. And we shouldn't be penalized that it took over 20 years to take this case to trial, and during that time period, they went out of business. Regarding... You agree there was a cross-appeal filed? There was. Okay. There was. There's no dispute about that? No, there's no dispute about that. Whether it was filed properly and whether the appendix was received, I don't know. But I did receive it. Regarding the fees and penalties, Mr. Hannigan brought up a couple of different issues. But overall, he noted that he wants more fees and penalties to be assessed against the entire award, including the part that was paid and unpaid. In this case, again, since it's so old, over 20 years, in TTD alone, over $668,934.04 were paid by the time it went to arbitration. And he's saying that the employer shouldn't receive the benefit of having paid that if they paid it, you know, the day before trial or something like that. This isn't the case. This was paid in the 90s, up through the date of arbitration. And so to award penalties on something that had already been paid will just encourage employees to keep prolonging litigation as long as possible because then they can get additional penalties at the time of arbitration. So we would say that's against public policy, obviously. Well, it might work. Time, value, and money might work better. Great. That's all. Do you have any other questions? I don't think we do. Thank you very much. Thank you, counsel, both, for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue.